**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **25-00246-eg**

## Amended Order Awarding Damages

The relief set forth on the following pages, for a total of 27 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**06/03/2025**



Entered: 06/03/2025

Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | C/A No. 25-00246-EG |
| Robert Weathers and Yolanda Weathers, | Chapter 13 |
| Debtor(s). | **AMENDED[1] ORDER AWARDING DAMAGES PURSUANT TO 11 U.S.C. § 362(k)** |

**THIS MATTER** is before the Court for a determination of damages based upon the Motion to Compel Turnover of Property Pursuant to 11 U.S.C. §§ 362 and 542 (the "Turnover Motion")[2] and the Motion for Rule to Show Cause and Impose Sanctions for Contempt ("Contempt Motion")[3] filed by Robert Weathers and Yolanda Weathers ("Debtors"). Debtors seek damages for willful violation of the automatic stay under 11 U.S.C. § 362(k) based upon the post-petition repossession of their 2015 Jeep Grand Cherokee (the "Vehicle") by Dinkins Auctions, LLC ("Dinkins Auctions"). The owner of Dinkins Auctions, Robert Dinkins ("Dinkins"), filed a *pro se* Response to the Turnover Motion on Dinkins Auctions' behalf.[4] After an initial hearing, resulting the in the Court ordering Dinkins Auction to return the vehicle to Debtors, and after a second hearing to address Dinkins Auctions' failure to comply with the Court's order, Jane Downey, Esq. filed a notice of appearance as counsel for Dinkins Auctions.[5] The Court held a continued hearing on the Turnover Motion and heard the Contempt Motion to address the § 362(k) issues and

---

[1] This Order is being amended solely to correct typographical errors in the damages amounts stated in the original Order entered at ECF No. 72 and does not change any deadline provided in the original Order and Judgment.

[2] ECF No. 21, filed Apr. 3, 2025.

[3] ECF No. 48, filed Apr. 21, 2025.

[4] ECF No. 31, filed Apr. 10, 2025. On April 11, 2025, the Court sent Dinkins Auctions a letter informing it that pursuant to SC LBR 9011-2, corporations and other business entities must be represented by an attorney duly admitted to practice in this District. *See* ECF No. 35. The letter further noted that unless an attorney duly admitted to practice as specified in SC LBR 2090-1 filed a notice of appearance in the case, "the Court may not take further action on your document or may enter other orders as may be deemed appropriate, including the imposition of sanctions."

[5] ECF No 67, filed May 19, 2025.

Debtors' request for damages (the "Damages Hearing") during which the Court heard testimony from both Debtors, Dinkins, and Katie Pimental, a paralegal employed with Debtors' counsel's firm ("Pimental").  The parties also introduced several exhibits into evidence.[6]  At the end of the Damages Hearing, the Court took the matter under advisement.

Dinkins Auctions does not dispute that it violated the automatic stay.  The issues remaining for the Court to decide are (1) whether the violation was "willful," and (2) if so, what damages should be awarded pursuant to 11 U.S.C. § 362(k).  Based on the record before the Court and the arguments of the parties, the Court finds that Dinkins Auctions' violation of the stay was willful and awards damages as set forth below.

## FACTUAL BACKGROUND

### A.  *Bankruptcy Filing and Repossession of the Vehicle*

Debtors purchased the Vehicle from Dinkins Auctions through a financing arrangement on or about December 3, 2024.[7]  Dinkins testified that Debtors were required to maintain insurance on the Vehicle with a maximum deductible of $500.[8]  According to Debtors' testimony, prior to January 6, 2025, the Vehicle was covered by an insurance policy with Progressive in both Debtors' names but was then moved to a different Progressive auto insurance policy held by Mrs. Weathers and her two daughters (the "Progressive Policy") to obtain a better rate.[9]  Documentation of the Progressive Policy shows Dinkins Auctions listed as a lienholder on the Vehicle.[10]  Dinkins testified that he received a cancellation notice for Debtors' prior insurance policy on the Vehicle

---

[6] Debtors' Exs. A-L and Dinkins' Ex. 1.  Debtors' Exs. A-J were also introduced at the Show Cause Hearing (defined *infra*) on May 6, 2025 with no objection by Dinkins.

[7] Debtors' Ex. D.

[8] Debtors did not dispute this requirement. Although Dinkins Auctions did not introduce the financing agreement into evidence, Dinkins provided a copy of the relevant portion of the financing agreement as an attachment to an email included in Debtors' Exhibit H.

[9] Debtors' Ex. J.

[10] *Id*. at 5.

on January 13, 2025, with the policy cancellation effective January 6, 2025.  Dinkins asserted he

did not receive any notice of substitute insurance on the Vehicle nor was he contacted by Debtors

regarding the change in insurance policy prior to the date the Vehicle was repossessed, though

Debtors testified that the Vehicle remained insured at all times.

Debtors filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code (the

"Voluntary Petition") on January 24, 2025 (the "Petition Date").   A signed Disclosure of

Compensation of Attorney (the "Disclosure of Compensation") filed with the Voluntary Petition

reflects that Debtors' counsel agreed to accept $6,000 to represent Debtors in the case.[11]   The

signed Bankruptcy Retainer Agreement also reflects that additional supplemental fees could be

incurred for, among other things, "work necessary as a result of unanticipated issues arising pre or

post-confirmation."[12]   The Disclosure of Additional Attorney's Fees attached to the Bankruptcy

Retainer Agreement lists the amount of supplemental fees, including a fee of $385 to be charged

for "Creditor Violation Letter/Analysis/Service Research/History" and provides that "[i]f any

additional work is needed, the Attorney rate for consumer cases is $330/per hour plus costs;

Paralegal rate is $85/per hour plus costs . . . ."[13]

Dinkins testified that he was not made aware of Debtors' bankruptcy case until after the

Vehicle was repossessed in March.   The Court's docket, however, reflects that on January 26,

2025, Dinkins Auctions was served with the Notice of Chapter 13 Bankruptcy Case, Meeting of

Creditors & Notice of Appointment of Trustee (the "Notice of Bankruptcy")[14] by mail sent to the

---

[11] ECF No. 1.  The agreed flat no-look fee excludes certain services for which additional fees would be incurred, including  "any other adversary proceeding, [d]efending § 362 Motion by creditor, . . . [c]ombined § 362 Motion by creditor and attending court, . . . [p]revention of §362 Motion, [d]efending §362 Motion by creditor after a previous claim for prevention has been filed, . . . [and] Creditor Violation Letter . . . ."  *Id.*, at 12.  Prior to December 1, 2024, turnover actions were required to be commenced through an adversary proceeding pursuant to Fed. R. Bankr. P. 7001. It is not uncommon for requests for § 362(k) also to be embedded in adversary proceedings.
[12] *Id.*, at 15.
[13] *Id.*, at 19-20.  For non-consumer cases, the hourly rate for Debtors' counsel is $500.
[14] ECF No. 2.

3

address listed for the business (the "Business Address") in its purchase contract with Debtors (the "Purchase Contract").[15]   Notably, the Business Address was the same address used for subsequent service of bankruptcy documents which Dinkins did not contest receiving.   Pimental also emailed Dinkins Auctions on the Petition Date to notify it of Debtors' bankruptcy case (the "January 24th Email"), attaching a copy of an electronic Notice of Bankruptcy Case Filing with Debtors' names and case number.[16]   The January 24th Email further stated that Debtors' counsel "request[s] that the pending repossession actions in regards to the vehicle, a 2015 Jeep Grand Cherokee, are canceled due to the automatic stay."   The email address to which the January 24th Email was sent is the same email address from which Dinkins later replied to subsequent emails from Pimental. At the Damages Hearing, Pimental testified that though Dinkins did not reply to the January 24th Email, she did not receive any notification that the email was undeliverable.   Dinkins, on the other hand, claimed he "doesn't do email" and did not see the January 24th Email until Pimental called him and referred to it after the Vehicle was repossessed.

In their schedules and statements of financial affairs, Debtors listed the Vehicle on Schedule A/B and Dinkins Auctions as a secured creditor on Schedule D.[17]   Debtors also listed ownership interests in two other vehicles: a 2017 Mercedes-Benz Sprinter van (the "Sprinter Van") and a 2015 Hyundai Santa Fe (the "Santa Fe").   Debtors filed a proposed chapter 13 plan (as amended, the "Plan") providing for payment in full—without valuation or lien avoidance—of

---

[15] ECF No. 7, filed Jan. 26, 2025 (Certificate of Service of the Notice of Bankruptcy).   Debtors' Exhibit D, which contains pages of the Purchase Contract, lists the address for Dinkins Auctions as 1941B Myrtle Beach Hwy, Sumter, SC 29153.
[16] Debtors' Ex. H, at 2-3.
[17] ECF No. 10.

Dinkins Auctions' secured claim with interest at 9.0%.[18]  Dinkins Auctions did not object to confirmation, and an amended version of the Plan was confirmed on May 14, 2025.[19]

On March 24, 2025—two months after the Petition Date—Dinkins Auctions repossessed the Vehicle from Debtors' home using a third-party towing service (the "Repossession").  At the Damages Hearing, Mrs. Weathers explained that the Vehicle was covered by the Progressive Policy until Debtors obtained a different insurance policy with SafeCo (the "SafeCo Policy"), which became effective on the day the Repossession occurred and had a $1,000 deductible.  Mr. Weathers corroborated his wife's testimony, reaffirming that the SafeCo Policy was in effect at the time the Vehicle was repossessed.[20]  He further explained that Debtors decided to change the Vehicle's insurance coverage to move it from the Progressive Policy back to one in both Debtors' names.  According to Mr. Weathers, Debtors provided a copy of the SafeCo Policy to Dinkins Auctions after the Repossession, but Dinkins Auctions still refused to return the Vehicle because the policy had the wrong deductible amount.

### B.  Events Following Repossession of the Vehicle

The Court has had to piece together the events that transpired between March 24, 2025—the date the Vehicle was repossessed—and April 3, 2025—when the Turnover Motion was filed—based on the testimony provided at the Damages Hearing and the emails between the parties introduced into evidence.[21]  At the Damages Hearing, Dinkins acknowledged receipt of multiple

---

[18] ECF No. 11.  The Plan was later amended on April 14, 2024, but Dinkins Auctions' treatment was unaltered.  ECF No. 41.

[19] ECF No. 65.

[20] Debtors' Ex. J. reflects that the SafeCo Policy was dated March 25, 2025, but had an effective date of March 24, 2025.

[21] In addition to copies of the email correspondence between Dinkins and Debtors' counsel's office previously mentioned (Debtors' Exhibit H), Debtors also presented into evidence copies of the first demand letter seeking return of the Vehicle, dated March 24, 2025 (Debtors' Exhibit F), and the second demand letter dated March 31, 2025 (Debtors' Exhibit G).

demand letters from Debtors' counsel between March 24 and April 2, 2025,[22] but said he informed Debtors' counsel that he would only return the Vehicle if Debtors presented proof of insurance on the Vehicle with a maximum deductible of $500.00[23] and provided him with a key to the Vehicle.[24] Dinkins testified he requested the key from Mr. Weathers when he came to Dinkins Auctions on or around March 27, 2025.  Dinkins explained he needed the key to return the Vehicle to Debtors because it is an all-wheel drive, so he believed further towing would cause damage to the Vehicle. Mr. Weathers testified SafeCo needed pictures of the Vehicle before it would reduce the insurance policy deductible to $500, so he went to Dinkins Auctions on two separate occasions requesting to see the Vehicle, but it was not at the Business Address and Dinkins would not say where it was being held.  Mr. Weathers acknowledged that Dinkins requested he provide the key during his second visit but testified he was reluctant to do so as he was concerned Dinkins Auctions would keep the key and sell the Vehicle without Debtors' consent.  Dinkins admitted he did not want to disclose to Mr. Weathers where the Vehicle was located because it was at an off-site lot where Dinkins Auctions stores repossessed vehicles; thus, he did not want the location to become public knowledge for fear that vehicle owners would unlawfully take back their property.  Dinkins further testified that Mr. Weathers told him the Vehicle was not supposed to be included as part of the bankruptcy case, which appears, based on what the Court can gather from his testimony, that Dinkins understood to mean that the Vehicle was not subject to the automatic stay.

---

[22] *See* Debtors' Ex. H.

[23] *See id.*  In an email dated April 2, 2025, Dinkins responded to Pimental, in part:
> We have NEVER denied your client the opportunity to get the jeep.  The vehicle is available to be picked up as long as PROPER INSURANCE is provided as agreed to by your client.  We require a $500 deductible.  I have told you this multiple times.  The jeep does not have proper coverage.  I have sent a copy of insurance requirements to you.

*Id.* at 21.

[24] The key was not discussed in any of the emails submitted to the Court in Debtor's Exhibit H.

### C.  Motions Seeking Turnover of the Vehicle and Orders of the Court

The Turnover Motion was filed on April 3, 2025.  In addition to requesting an order compelling the Vehicle's immediate return, Debtors also asked the Court to hold Dinkins Auctions in contempt for willfully violating the automatic stay and award Debtors actual damages, including attorney's fees and costs, and punitive damages.  Dinkins filed a response to the Turnover Motion on behalf of Dinkins Auctions, without the assistance of counsel, asserting that the Vehicle "was repossessed for improper insurance deductible" and stating that he was "counter suing for $25,000 for the harassment and intimidation I have received from Moss & Assoc."[25]  Dinkins also filed a pleading that was treated as a Motion to Dismiss, which did not make clear what specific relief was sought and which the Court later denied.[26]

Following an emergency hearing on April 15, 2025, the Court entered an order requiring Dinkins Auctions to return the Debtors' Vehicle by 5:00 p.m. on April 18, 2025 (the "Turnover Order").[27]  In the Turnover Order, the Court found that Debtors had satisfied the elements for turnover and concluded that Dinkins Auctions had proper notice of Debtors' bankruptcy filing but failed to return the Vehicle upon request.[28]  In addition to requiring Dinkins Auctions to deliver, at its sole expense, the Vehicle to Debtors' residence, the Turnover Order required Debtors to update their insurance policy on the Vehicle to provide for a maximum $500.00 deductible in accordance with the terms of their financing agreement.  The Turnover Order also required Dinkins Auctions to retain counsel pursuant to SC LBR 9011-2(c) if it intended to file further pleadings in this case.  Dinkins Auctions was served with a copy of the Turnover Order by certified mail and

---

[25] ECF No. 31, filed Apr. 10, 2025.

[26] *See* ECF Nos. 32 and 61.

[27] ECF No. 45, filed Apr. 15, 2025

[28] More specifically, the Turnover Order found: "The evidence indicates that Dinkins Auctions had notice of Debtors' bankruptcy filing and notice of the [Turnover Motion] yet failed to return the Vehicle upon request."  *Id*. at 5.  The Turnover Order was not appealed, and no motion to reconsider was ever filed.

email.[29]  Despite acknowledging receipt of the Turnover Order; Dinkins Auctions did not return the Vehicle to Debtors.

Debtors subsequently filed the Contempt Motion, arguing that Dinkins Auctions willfully violated the automatic stay and that Debtors were entitled to damages pursuant to 11 U.S.C. § 362(k).  Debtors requested that the Court (1) find Dinkins Auctions in contempt of the Court's Turnover Order; (2) impose coercive sanctions of $250 per day beginning April 21, 2025, until Dinkins Auctions complied with the Turnover Order; (3) award actual damages of $5,000 for lost wages, personal property damage, and out-of-pocket insurance costs for the period of time that Debtors were without the Vehicle and unable to reduce their deductible; (4) punitive damages of $9,801.12[30] (either in addition to or in lieu of the daily coercive sanctions); (5) attorney's fees of $7,400; and (6) service and mailing costs totaling $314.00.  In support of their request for damages, the Contempt Motion included affidavits from both Debtors dated April 21, 2025.  Among other things, Mrs. Weathers stated in her affidavit that while the Vehicle was the only car she used for her work as a food delivery driver and she "missed out on some work" as a result of the Repossession, she "now had to use the other vehicle (Hyundai [Santa Fe]), that was initially intended to be a spare family car" that her daughter had been using.

On April 23, 2025, the Court entered an Amended Order Directing a Representative of Dinkins Auctions to Appear and Show Cause Why It Should Not Be Held in Contempt of Court and setting a hearing on the Motion for Sanctions for May 6, 2025 (the "Show Cause Order").[31] The Show Cause Order further ordered the payment of sanctions of $100.00 per day beginning on

---

[29] ECF No. 46, filed Apr. 16, 2025.

[30] At the Damages Hearing, Debtors' counsel explained that the amount requested for punitive damages is based on the total debt Debtors estimate they owe on the Vehicle.  *See* ECF No. 10 (reporting in Debtors' Schedule D a claim of Dinkins Auctions secured by the Vehicle in the amount of $9,801.12).

[31] ECF No. 50.  The Court issued a prior version of the Show Cause Order on April 22, 2025 (ECF No. 49) but issued the amended Show Cause Order to correct a typographical error regarding the hearing time.

April 19, 2025 through the date the Vehicle was returned to Debtors for failure to comply with the Turnover Order, but specified that Dinkins Auctions could purge itself of contempt if it turned the Vehicle over to Debtors and appeared in person at the May 6, 2025 hearing.  At the Court's request, Debtors' Counsel filed an Affidavit of Attorney's Fees on May 1, 2025, as well as a supplementary itemization of mailing and administrative expenses related to this matter on May 19, 2025.[32]

The hearings on the Turnover Motion, the Motion for Sanctions, and the Show Cause Order were conducted on May 6, 2025 (collectively, the "Show Cause Hearing").  Debtors attended with their counsel and Dinkins appeared on behalf of Dinkins Auctions without an attorney.[33] Following the Show Cause Hearing, the Court entered a further order on Debtors' Turnover Motion, requiring Dinkins Auctions to return the Vehicle to Debtors by 5:00 p.m. on May 6, 2025, and placing in abeyance the imposition of daily sanctions in the amount of $100 per day, contingent upon full compliance with its order.[34]  Dinkins returned the Vehicle to Debtors on May 6, 2025.[35]

### D.  Testimony and Evidence Presented Regarding Damages

At the Damages Hearing, Mrs. Weathers testified that she is self-employed and uses the Vehicle for her business providing delivery services.  She testified that after the Repossession, she was unable to use the Vehicle for her work delivering groceries and Walmart orders, through which she usually aims to earn between $120-130 per day.  As a result, she and her husband have had difficulty making their plan payments to the trustee.  She acknowledged, however, that after the

---

[32] ECF Nos. 53, 55, and 68.
[33] While the Court allowed Dinkins to speak at the Show Cause Hearing, it noted that, as he had previously been notified, he may not be allowed to argue or present evidence at the Damages Hearing unless Dinkins Auctions was represented by counsel as required by SC LBR 9011-2.
[34] ECF No. 60, entered May 6, 2025.
[35] At the Damages Hearing, Dinkins continued to assert that the reason for the six-week delay in returning the Vehicle after Debtors' initial request and despite the Turnover Order was because he did not have the key to the Vehicle and was concerned about damaging it if he towed it back to Debtor's home because it is an all-wheel drive vehicle.  He also indicated that he had been waiting on Debtors to provide proof of insurance with the proper $500.00 deductible amount.

Vehicle was repossessed, Debtors continued to have the Sprinter Van and Santa Fe available for their use.[36]    Though the Santa Fe was not able to be driven when the Repossession occurred because it did not have any tags, Mrs. Weathers stated that they obtained the necessary registration and put the Santa Fe back to use shortly after the Repossession.    She also testified that she experienced stress and humiliation from the repossession of the Vehicle and said that Debtors' yard was damaged from the tow truck dragging the Vehicle across it.[37]    Mr. Weathers corroborated his wife's testimony that their yard was damaged by the Repossession but stated that they did not spend any money to repair it. Mrs. Weathers further testified that when the Vehicle was returned, an unspecified amount of money was missing from the Vehicle.    Moreover, the Vehicle appeared to have been driven, as there was debris inside it, the odometer reflected higher mileage, and there was less gas in the tank.    On cross-examination, Mrs. Weathers acknowledged that Debtors did not have any documentation as to her ordinary business income, her lost income after the Repossession, or any medical costs incurred due to emotional distress.

To support the request for attorney's fees and costs, Debtors' counsel introduced into evidence affidavits of three attorneys and three paralegals who worked on the turnover action (the "Affidavits"), which included time entries  billed at half-hour increments with the exception of one paralegal who billed using 0.25 hourly increments.[38]    The Affidavits assert that between March 24, 2025 and May 1, 2025, a total of 30.50 hours of work was performed by three attorneys: Jason Moss (3 hours at a billing rate of $500 per hour); Heather Bailey (10.5 hours at a billing rate of $400 per hour), and Roger Pruitt (17 hours at a billing rate of $350 per hour).    Moreover, the

---

[36] Though both the Sprinter Van and the Santa Fe were repossessed by other creditors prior to Debtors filing for bankruptcy, Mrs. Weathers testified that they were returned to Debtors before the Vehicle was repossessed.

[37] Debtors presented a photograph of the damage to the lawn, which was admitted into evidence as part of Debtors' Exhibit I.

[38] Debtors' Ex. K; *see also* ECF No. 55.

Affidavits reflect that the paralegals working for Debtor's counsel on this matter billed a total of 17.25 hours at the hourly rate of $150.00.  In total, the Affidavits submitted into evidence reflect $14,237.50 in attorneys and paralegals' fees.[39]  Debtors' counsel also introduced the itemized list of mailing and administrative costs incurred from March 24, 2025 to April 24, 2025, which total $382.00.[40]

At the Damages Hearing, the Court requested explanation from Debtors' counsel regarding (a) the inconsistency between the hourly rate of $330 for "additional work" reflected in the Bankruptcy Retainer Agreement and the different hourly rates billed by the three attorneys in the Affidavits and (b) why at least part of the paralegal work would not be billed at a flat rate of $85 per hour consistent with the Disclosure of Additional Attorney's Fees attached to the executed Bankruptcy Retainer Agreement and filed with Debtors' voluntary petition.  Counsel for Debtors clarified that Debtors were not seeking reimbursement for fees incurred by the paralegals or Mr. Moss.  Ultimately, Debtors' counsel requested that the Court grant (1) attorney's fees for 17 hours of work performed by Mr. Pruitt and 12.5 hours performed by Ms. Bailey (including the 10.5 hours previously requested and 2 additional hours for attending the Show Cause Hearing) at the hourly rate of $330.00,[41] and (2) costs of $382.00—for a total of $10,117.00 in legal fees and costs.  Aside from arguing that his violation of the automatic stay was not willful, Dinkins raised no objection to the amount or reasonableness of Debtors' requested legal fees.

---

[39] The Affidavits represent that the fees totaled $14,537.50, which appears to be an error.

[40] *See also* ECF No. 68.

[41] Notably, it appears from the time entries submitted into the record that Roger Pruitt started working on the matter on March 24, 2025—the date of the Repossession, whereas Heather Bailey did not start billing for the matter until April 12, 2025.

## DISCUSSION AND CONCLUSIONS OF LAW

Debtors ask the Court to (1) find that Dinkins Auctions willfully violated the automatic stay by repossessing the Vehicle post-petition with knowledge of Debtors' bankruptcy case, and (2) award actual and punitive damages.  The Court will address each issue in turn.

Section 362(k)(1) of the Bankruptcy Code provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1).  To recover damages for a willful violation of the automatic stay, a debtor must establish five elements: (1) a bankruptcy petition was filed, (2) the debtor is an "individual" under the automatic stay provision, (3) the creditor received notice of the petition, (4) the creditor's actions in violation of the stay were willful, and (5) the debtor suffered damages.  *Ard v. Zold* (*In re Ard*), 668 B.R. 395, 401 (Bankr. D.S.C. 2025) (citing *Defeo v. Winyah Surgical Specialists, P.A.* (*In re Defeo*), 635 B.R. 253, 262 (Bankr. D.S.C. 2022)); *Payne v. Blue Ridge Cars & Trucks, LLC* (*In re Payne*), 666 B.R. 313, 318 (Bankr. D.S.C. 2024).  Debtors carry the burden of proof and must prove a willful violation of the automatic stay by a preponderance of the evidence. *Defeo*, 635 B.R. at 262 (citing *Warren v. Dill* (*In re Warren*), 532 B.R. 655, 660 (Bankr. D.S.C. 2015)); *In re Banks*, 612 B.R. 167, 172 (Bankr. D.S.C. 2020).

### I.    *Dinkins Auction Had Notice of the Bankruptcy Filing*

It is undisputed that Debtors filed a bankruptcy petition and are individuals protected by the automatic stay.  Dinkins Auctions does not dispute that it repossessed the Vehicle after Debtors commenced their Chapter 13 bankruptcy case but claims that it was not aware of Debtors' bankruptcy case at the time of the Repossession; thus, it asserts that its violation of the stay was not willful.  As set forth in the Turnover Order, the certificate of service of the Notice of

Bankruptcy reflects that Dinkins Auctions was served by mail sent on January 26, 2025 to the Business Address.

Pursuant to Bankruptcy Rule 9006(e), "[s]ervice by mail of process, any other document, or notice is complete upon mailing." Fed. R. Bankr. P. 9006(e). This rule creates a rebuttable presumption that the paper mailed was received by the party to whom it was sent. *In re Boyd,* 618 B.R. 133, 163 (Bankr. D.S.C. 2020) (noting that this presumption is "very strong" and "can only be rebutted by specific facts and not by invoking another presumption and not by a mere affidavit to the contrary. . . . [a] general denial does not constitute the strong evidence needed to overcome the presumption of receipt")*; In re Foxwood Hills Property Owners Assoc., Inc.*, 628 B.R. 891, 896 (Bankr. D.S.C. 2021) (same); *In re Warren*, 532 B.R. at 662 (same). "To invoke the presumption, a party must prove that the letter was properly addressed, stamped, and mailed." *Id.* (citing cases). The Court finds that the certificates of service filed on the case docket to evidence service of the Notice of Bankruptcy is adequate to invoke the presumption of receipt, and previously concluded as much in the Turnover Order. *Id.* Dinkins Auctions denies receiving notice of the bankruptcy case but has presented no evidence that the mailing was not actually accomplished. Dinkins' mere denial of receipt of notice is insufficient to rebut the presumption, especially when he does not dispute having received service of other documents at the same Business Address. Moreover, the January 24th Email sent to the same email address from which Dinkins sent subsequent emails to Pimental, combined with Pimental's testimony that she did not receive any notice that the email was undeliverable, further shows that Dinkins Auctions was put on constructive notice of Debtors' bankruptcy filing. *See In re Nocek*, No. 19-01364-5-SWH, 2020 WL 1809790, at *3 (Bankr. E.D.N.C. Apr. 7, 2020) (citing *Weatherford v. Timmark (In re Weatherford),* 413 B.R. 273, 283 (Bankr. D.S.C. 2009) ("Proof of a violation of the automatic stay

does not require actual notice, and constructive notice may suffice.").[42]  The assertion that Dinkins "doesn't do email" further renders his denial of notice prior to the Repossession not credible.  The Court concludes that the presumption of receipt of adequate notice of Debtors' bankruptcy filing has not been rebutted.

Even if notice had not been received as of March 24, 2025 when the Repossession occurred, it is undisputed that Dinkins Auctions received actual notice of the bankruptcy in the afternoon of March 24, 2025 when Pimental sent Dinkins an email attaching the demand letter also mailed to Dinkins Auctions, to which he responded on March 26, 2025.  Despite knowing of Debtors' bankruptcy, Dinkins Auctions retained the Vehicle until May 6, 2025, claiming that it would not return it because it had no key to the vehicle and the amount of the deductible on Debtors' insurance policy was not as provided for in the financing agreement.

## II.     Dinkins Auctions' Repossession of the Vehicle Constitutes a Willful Violation of the Automatic Stay

Finding that the element of notice is satisfied, the Court must next determine whether Dinkins Auctions' actions violating the automatic stay were willful.  To be liable for a willful violation under § 362(k), "the creditor need not act with specific intent to violate the automatic stay but must only commit an intentional act with knowledge of the automatic stay." *Payne*, 666 B.R. at 316; *Defeo*, 635 B.R. at 262 (citing *Citizens Bank of Md. v. Strumpf*, 37 F.3d 155, 159 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 16 (1995)).  Accordingly, to determine whether an act is willful, the Court applies an objective analysis of the facts without considering the subjective intent of the creditor.  *Warren*, 532 B.R. at 662-63.  "A willful violation of the automatic stay

---

[42] *See also In re Lyle*, 662 B.R. 229, 235 (Bankr. E.D.N.C. 2024) (noting that notice of the bankruptcy filing need not be formal or official to put a creditor on notice; rather, "[t]he communication must provide sufficient detail to put the creditor on notice of the stay violation"); *In re Edgewater Constr. Grp.*, 653 B.R. 221, 227 (Bankr. S.D. Fla. 2023) ("The law is very clear that once a party has notice that a bankruptcy has been filed, that party cannot just ignore that information until receiving the information in the form that party would like to have it.").

occurs when a 'creditor knows of the pending bankruptcy petition and intentionally attempts to continue collection procedures in spite of it.'" *Id.* at 660 (citing *Weatherford,* 413 B.R. at 284).

"Once a creditor or other actor learns—or is put on notice of—[a] debtor's bankruptcy filing, any actions intentionally taken thereafter in violation of the automatic stay are in nature, 'willful' stay violations." *In re Lyle*, 662 B.R. 229, 235 (Bankr. E.D.N.C. 2024). Where the debtor proves that the creditor had actual notice of the automatic stay, the burden shifts to the creditor to prove that it "took steps to prevent violations of the automatic stay and rebut the inference that the stay violation was willful." *Defeo*, 635 B.R. at 263 (citing *In re Rijos*, 263 B.R. 382, 392 (B.A.P. 1st Cir. 2001)). As discussed above, Dinkins has not rebutted the presumption that the notice of Debtors' bankruptcy case was properly served on him upon the bankruptcy filing, and Dinkins testified that he had actual knowledge of the automatic stay as of March 24, 2025, just after the Repossession occurred and he was contacted by Debtors' counsel's office. Thus, the burden of proof shifts to Dinkins Auctions to rebut the inference its continued violation of the stay was willful.

Dinkins Auctions argues that the stay violation was not willful because Dinkins believed that (1) the Repossession was justified based on an apparent lapse in the Vehicle's insurance coverage, (2) the continued retention of the Vehicle despite Debtors' counsel's turnover demands was justified because the SafeCo Policy did not satisfy the requirements of Debtors' financing agreement and because Debtors refused to provide a key to the Vehicle as he requested, and (3) the Vehicle was not part of the bankruptcy case based on statements that Mr. Weathers made to Dinkins after the Repossession. After having observed Dinkins' demeanor and testimony at the hearings held before this Court, the Court does not find these arguments credible and concludes they have no merit.

A creditor's good faith belief that it was not violating the stay is not relevant in determining whether there has been a stay violation. *Warren,* 532 B.R. at 663. "There is no exception in § 362 for property that a creditor unilaterally decides to exclude from protection of the automatic stay or for a creditor that decides to repossess property because it believes (correctly or incorrectly) that the insurance has lapsed." *In re Chambers,* 605 B.R. 720, 725 (Bankr. D.S.C. 2019). Moreover, these beliefs are premised on Dinkins' mistaken understanding of the law—what constitutes a violation of the automatic stay, what violations are defensible, and what the scope of that stay is— which is not a valid defense. *See In re Scungio Borst & Assocs., LLC*, 652 B.R. 644, 652 (Bankr. E.D. Pa. 2023) (citing *In re Nixon*, 419 B.R. 281, 288 (Bankr. E.D. Pa. 2009)) ("A good faith mistake of law or dispute as to the creditor's right to take the action does not negate the willfulness of the violation."); *In re Webb*, No. BAP 11–8016, 2012 WL 2329051, at *15 (B.A.P. 6th Cir. Apr. 9, 2012) (holding that a creditor's good faith belief that its intentional actions did not violate stay is no defense to liability for willfully violating automatic stay even if creditor's belief is based on mistake of law or legal dispute regarding its rights).

The evidence before the Court indicates that Dinkins Auctions had notice of the Debtors' bankruptcy case before the Repossession and intentionally had the Vehicle repossessed while the case was pending. The evidence also shows that Dinkins intentionally retained the Vehicle in violation of the automatic stay for six weeks after being notified of the stay violation and improperly conditioned the return of the Vehicle on Debtors tendering a key and obtaining an insurance deductible consistent with their financing agreement. Such acts go beyond mere retention of estate property after the filing of a bankruptcy case, which the Supreme Court in *City of Chicago v. Fulton* held does not in and of itself constitute a stay violation, because the Repossession changed the status quo as it was as of the Petition Date: Debtors having full

possession and use of the Vehicle. *See* 592 US 154, 161-62 (2021).  Moreover, Dinkins Auctions disregarded an order of this Court requiring him to return the Vehicle by April 18, 2025 and continued to retain the Vehicle even after the Court entered an order directing Dinkins Auctions to appear and show cause as to why it should not be held in contempt of court, which threatened sanctions for its failure to comply with the Turnover Order.  For these reasons, the Court concludes that Dinkins Auctions' actions in this case amount to a willful violation of the automatic stay.

### III. Actual and Punitive Damages to Be Awarded

The last element left for the Court to decide is the damages that Debtors suffered or incurred.  "[A]n individual injured by any willful violation of a stay provided by [§ 362(k)] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1).  Debtors also bear the burden of proof on damages and must present concrete, non-speculative evidence supporting their damages claim. *Banks,* 612 B.R. at 172 (citing *Warren,* 532 B.R. at 660).  Here, Debtors are requesting that the Court award actual compensatory damages of $5,000, attorney's fees and costs, and $9,801.12 in punitive damages.  For the reasons explained herein, the Court will award some damages, but not to the extent of those requested.

### A.  Actual Damages

"An award of damages under section 362(k) must be founded on 'concrete, non-speculative evidence' and cannot be based merely on 'speculation, guess or conjecture.'" *Banks,* 612 B.R. at 173 (citing cases).  As a result of the wrongful repossession and retention of their Vehicle, which deprived them of use of the Vehicle for 43 days, Debtors assert that they have suffered economic harm and emotional distress.  Debtors seek compensation for multiple types of actual damages but provided little to no proof to substantiate them, leaving the Court without concrete evidence from

which to determine the monetary value of Debtors' injuries.  For example, Debtors did not present any evidence of out-of-pocket expenses they incurred.  While both Debtors testified about the physical damage done to their yard by the tow truck that removed the Vehicle from their property, Mr. Weathers testified that they had not taken steps to repair their yard, and no evidence was offered regarding the estimated cost of such repairs.  Mr. Weathers also testified that he had to make two separate trips to Dinkins Auctions to attempt to get pictures of the Vehicle for insurance purposes but did not provide the Court with any information regarding the mileage or gas expenses for these trips.  Similarly, Debtors did not establish the amount for which they should be compensated for insurance costs incurred while they were unable to use the Vehicle or adjust the policy deductible.  The Court is unable to speculate as to an appropriate amount of damages to reimburse Debtors these losses.

### 1. *Lost Wages*

Debtors' testimony regarding their lost wages due to the Vehicle Repossession was also too speculative for the Court to award compensation for such damages.  Both Debtors testified that only Mrs. Weathers uses the Vehicle and that they were in possession of the Sprinter Van that Mr. Weathers uses for work while they were deprived of the Vehicle.  Mrs. Weathers testified that in her work as a delivery driver, for which she usually uses the Vehicle, she tries to earn between $120-130 per day but her income varies because she is paid at a variable rate per delivery.  No documentary evidence was presented to show her historical earnings.  Without a clear understanding of what Mrs. Weathers' income is when she has full use of the Vehicle, it is impossible for the Court to determine the extent to which her income deviated from the norm during the 43 days without the Vehicle.

18

More importantly, while Mrs. Weathers testified that she was unable to work while deprived of the Vehicle, she admitted that Debtors had the Santa Fe available for their use and did not sufficiently explain why she was not able to use that vehicle for deliveries. Her general assertion that she was unable to work without the Vehicle was also inconsistent with her testimony that Debtors put their Santa Fe back on the road shortly after the Repossession occurred, after they obtained proper registration for it. Moreover, while not formally introduced into evidence, Mrs. Weathers' affidavit filed with Debtors' Motion for Sanctions indicated that she only missed "some" work and had begun using the Santa Fe for deliveries before the Vehicle was returned. Debtors have a duty to mitigate their damages, such as by using another vehicle that was available for their use. *In re Brittner,* No. 20-02454-DD, 2021 WL 2389285 at *4 (Bankr. D.S.C. June 10, 2021) ("A debtor, however, has a duty to mitigate any damages that may occur as a result of a stay violation") (quoting *Preston,* 333 B.R. 346, 350 (Bankr. M.D.N.C. 2005)).

Given the discrepancies in testimony and the indications that Mrs. Weathers was able to use the Santa Fe for her delivery work for at least part of the time Debtors were deprived of the Vehicle, Debtors have not satisfied their burden of proving the damages they seek for lost wages. Debtors' argument that lost income from the repossession caused them to fall behind on their plan payments to the Chapter 13 trustee is also not persuasive for the same reason.

### 2. *Emotional Distress*

Emotional distress damages are recoverable as actual damages under 11 U.S.C. § 362(k). *See Weatherford,* 413 B.R. at 288-89. As this Court noted in *Defeo*:

> While the Fourth Circuit has not set forth a standard for awarding damages for emotional distress, this Court has consistently required credible and convincing evidence that clearly shows a willful violation caused measurable harm to debtor to merit a damages award for emotional distress. . . . The Court exercises caution in awarding compensation for emotional distress because these damages are difficult to prove and easier to manufacture than other types of damages.

19

635 B.R. at 266 (citing cases).

Here, Mrs. Weathers testified that she experienced stress and humiliation as a result of Dinkins Auctions' conduct.  No evidence of any physical symptoms she experienced as a result of this stress and humiliation was presented, and Mrs. Weathers testified that she did not seek any medical treatment for her distress.  *See In re Hamrick,* 627 B.R. 619 (Bankr. D.S.C. 2021) (finding that the debtor failed to meet burden of proving that an award of emotional distress damages was appropriate where debtor did not present any testimony or other evidence indicating that he experienced any physical ailments that required medical treatment or medication resulting from his stress).  Moreover, Mrs. Weathers testified that she was already experiencing stress even before the Repossession occurred due to Debtors' strained finances and being in bankruptcy, making it difficult to tease out what distress was caused by Dinkins Auctions and what was due more generally to Debtors' pre-existing financial situation.   *See Lyle,* 662 B.R. at 229 (finding insufficient evidence to show direct causal connection or nexus between the debtor's already-existing emotional distress and new or increased anxiety directly resulting from the stay violation). Based on the evidence presented, the Court finds that damages for emotional distress are not warranted in this case.

### 3. *Attorney's Fees and Costs*

Having concluded that Dinkins Auctions is liable for a willful violation of the automatic stay, the Court finds that Debtor is entitled to an award of reasonable attorney's fees and costs in this case pursuant to § 362(k)(1).  *See In re Paugh*, Adv. Pro. No. 1:22-ap-00006, 2023 WL 3009881, at *3 (Bankr. N.D.W. Va. Apr. 19, 2023) (citing *In re Repine*, 536 F.3d 512, 522 (5th Cir. 2008) ("[I]t is proper to award attorney's fees that were incurred prosecuting a section 362(k) claim.")) ("The plain language of § 362(k)(1) expressly states that attorney's fees are actual

damages.").  "The Court determines the amount of reasonable attorney's fees to be awarded by

applying the lodestar method: determining the number of hours reasonably spent on the case and

multiplying that number by a reasonable hourly rate."  *Warren*, 532 B.R. at 664 (citing *Robinson*

*v. Equifax Info. Servs*., 560 F.3d 235, 243 (4th Cir. 2009)); *see also Defeo*, 635 B.R. at 268-69.  As

explained by the court in *Paugh*, the Fourth Circuit has endorsed a three-part standard to calculate

attorney's fees under the lodestar approach:

> First, the court must determine the lodestar figure by multiplying the number of
> reasonable hours expended times a reasonable rate.  To ascertain what is reasonable
> in terms of hours expended and the rate charged, the court is bound to apply the
> factors set forth in *Johnson v. Georgia Highway Express Inc.,* 488 F.2d 714, 717-
> 19 (5th Cir. 1974).  Next, the court must subtract fees for hours spent on
> unsuccessful claims unrelated to successful ones.  Finally, the court should award
> some percentage of the remaining amount, depending on the degree of success
> enjoyed by the plaintiff.

*Paugh*, 2023 WL 3009881, at *2 (*quoting In re Lumber Liquidators Chinese-Manufactured*

*Flooring Prod. Mktg. Sales Pracs & Prod. Liab. Litig*., 27 F.4th 291, 303 (4th Cir. 2022)).  The

*Johnson* factors that guide the Court in determining what constitutes a reasonable rate and number

of hours are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised;

(3) the skill required to properly perform the legal services; (4) the attorney's opportunity costs in

pressing the instant litigation; (5) the customary fee for similar work; (6) whether the fee is fixed

or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount in

controversy and the results obtained; (9) the experience, reputation, and ability of the attorney;

(10) the "undesirability" of the case within the legal community in which the suit arose; (11) the

nature and length of the professional relationship between the attorney and client; and (12) the

amount of attorney's fees awards in similar cases.  488 F.2d 714, 717 (5th Cir. 1974); *see also*

*Warren*, 532 B.R. at 664 (applying the *Johnson* factors to award fees in the amount of $8,200 plus

costs to pursue an action for the willful violation of the automatic stay); *In re Charity*, Adv. Pro.

No. 16–03121–KLP, 2017 WL 3580173, at *26 (Bankr. E.D. Va. Aug. 5, 2017) (applying the *Johnson* factors in a § 362(k) action).

Additionally, courts frequently apply the standards used in determining the reasonableness of compensation under § 330 to determine the reasonableness and necessity of fees to be awarded in the prosecution of a § 362(k) action.[43] *See Paugh*, 2023 WL 3009881, at *2 (citing *In re Voll*, 512 B.R. 132, 141 (Bankr. N.D.N.Y. 2014)); *In re Waters*, 634 B.R. 478 (Bankr. D.S.C. 2021) (employing § 330 to review fees that were billed for settling § 362(k) action). Courts also consider whether the amount of attorney's fees sought are proportional relative to the other damages claimed by the debtors. *See Defeo,* 635 B.R. at 272 ("The fees must be reasonable compared to the results obtained."). An attorney's compensation may be limited to the amount that would be earned if the matter was handled more efficiently. *Id.* "Discretion remains with the court to eliminate unrelated or excessive fees." *Paugh*, 2023 WL 3009881, at *2 (citing *Am.'s Servicing Co. v. Schwartz–Tallard* (*In re Schwartz–Tallard*), 803 F.3d 1095, 1101 (9th Cir. 2015) (en banc)).

Here, Debtors are seeking an award of $10,117.00 in attorney's fees and costs in connection with the Turnover Motion, based on 29.5 hours of attorney work billed at $330 per hour and expenses of $382. Considering the lodestar method and the fact that Dinkins Auctions did not raise any objections or concerns with respect to the attorney's fees requested, the Court determines that the $330 hourly rate requested is not unreasonable. *See id.* (granting attorney's fees billed at a rate of $375 per hour); *Defeo*, 635 B.R. at 268 (finding $400 per hour of in-court services and $350 per hour for out-of-court services to be reasonable). However, when considering the factors as set forth by *Johnson* and 11 U.S.C. § 330, and after a thorough review of the time entries

---

[43] Subsections (A) through (F) of 11 U.S.C. § 330(3) set forth relevant factors for courts to consider in determining what amount constitutes reasonable compensation, some of which overlap with the *Johnson* factors.

submitted with the Affidavits, the factors weight in favor of a reduction in the total attorney fees to be awarded.

To begin with, the Court notes that the time entries attached to the Affidavits reflect some unnecessary duplication of services billed. For example, in connection with the initial hearing on the Turnover Motion held on April 15, 2025, Mr. Pruitt billed 1.5 hours for "[r]eview[ing] file in preparation of hearing, discuss[ing] facts and plan for turnover hearing with Attorney" and 2 hours for "[a]ttend[ing] turnover hearing and debriefing with other Attorney[s] (HB and JTM) post hearing."[44] Ms. Bailey billed the same amount of time for identical tasks related to the same hearing. Mr. Pruitt also billed 2.5 hours on April 2, 2025 for the following:

> Researched willful violation of the automatic stay, post-petition repossession and possible solutions. Drafted Motion to Compel Turnover of Property and Motion for Expedited Hearing Filed with Court. Discussed the Motion to Compel Turnover and related case law issues with Attorney (JTM).

This entry is similar to the 2 hours that Ms. Bailey billed on April 14, 2024 for "[l]egal research and case law review on post-petition repossession and san[c]tions." Considering the time and labor expended for these tasks, coupled with the novelty and difficulty of the questions raised and the skill required to properly perform the legal services rendered, the Court finds that these time entries reflect an unnecessary duplication of services, especially considering that Mr. Pruitt, while present in the courtroom at the April 15th hearing, did not make an appearance or participate in presenting any arguments. Accordingly, the Court will reduce the amount of fees Debtors seek for Mr. Pruitt's time by 6 hours. The other time entries for Mr. Pruitt reflect services performed prior to Ms. Bailey's involvement in this matter and/or tasks different than those performed by Ms. Bailey; accordingly, the Court finds fees for those services to be reasonable.

---

[44] Debtors' Ex. K.

As to Ms. Bailey's time, Debtors are requesting the award of 10.5 hours of services she rendered as set forth in the Affidavits, in addition to 2 hours of her time incurred at the Show Cause Hearing, for a total of $4,125.00.  The Court notes that Counsel should also be compensated for some of her time spent at the Damages Hearing, which lasted approximately 3 hours.  However, given counsel's apparent lack of organization in presenting the evidence to the Court and unproductive questioning of the witnesses, which caused unnecessary delay in the presentation of the case, and taking into account the factors the Court must consider in awarding attorney's fees, the Court will reduce the 3 hours to 2 hours of time spent for attending the Damages Hearing.[45]

Lastly, the Court notes that Debtors' counsel billed in half-hour increments, instead of the widely recognized and accepted increment of one-tenth of an hour.  *See Waters*, 634 B.R. at 502 ("Deviation from the one-tenth hour standard creates difficulty in the evaluation of time and creates an appearance of inflated time for minor tasks.")  Because it is difficult to tell whether Debtors' counsel's time entries are inflated by the use of larger time increments, the Court will discount the amount of time allowed by 30%. Combining 11 hours allowed for Mr. Pruitt's services and 14.5 hours allowed for Ms. Bailey's services for a total of 25.5 hours—or $8,415—and reducing that total by 30% results in an adjusted total of $5,890.50, and adding the $382 in costs documented in Debtors' Exhibit L, the Court grants an award of $6,272.50 for attorney's fees and costs.

### B.  Punitive Damages

Debtors also seek an award of punitive damages, which may be awarded in appropriate circumstances pursuant to 11 U.S.C. § 362(k).  "Courts award punitive damages under § 362(k) for intentional or egregious conduct in order to deter similar future conduct."  *Davis v. JL Auto*

---

[45] To be clear, counsel for Dinkins Auctions was in part responsible for excessively prolonging the hearing due to unnecessary or unfounded evidentiary objections and lack of organization the Court expects in evidentiary hearings, but her lack of preparation was in part excusable given that she was retained only a day or two before the hearing.

*Sales* (*In re Davis*), 651 B.R. 192, 194 (Bankr. D.S.C. 2023).  Though the Bankruptcy Code does not define what would constitute "appropriate circumstances," punitive damages usually require "more than [a] mere willful violation of the automatic stay."  *In re Banks*, 577 B.R. 659, 669 (Bankr. E.D. Va. 2017) (quoting *In re Brown*, 237 B.R. 316, 320–21 (Bankr. E.D. Va. 1999)). "Punitive damages are appropriate where the creditor's actions 'demonstrate a disdain for the financially vulnerable customers it purports to serve and an utter disregard for the automatic stay.'" *Lyle*, 662 B.R. at 238 (quoting *In re Franklin*, 614 B.R. 534, 542 (Bankr. M.D.N.C. 2020).  "The amount awarded should deter both the creditor and others, and should motivate the creditor to devote the resources necessary to correct the deficiencies in its bankruptcy procedures." *Franklin*, 614 B.R. at 550 (citation and internal quotation omitted).  Courts have found it appropriate to grant punitive damages in cases involving a willful violation of the stay related to the post-petition repossession and retention of a debtor's vehicle, even where actual damages were low, to deter similar violations in the future.  *See, e.g.*, *Payne*, 666 B.R. at 320 (granting $4,292.75 in punitive damages); *Davis*, 651 B.R. at 195 (Bankr. D.S.C. 2023) (granting punitive damages of $12,000 where the creditor's egregious conduct "demonstrate[d] disregard for this Court and the protections provided to a debtor by the Bankruptcy Code"); *Franklin*, 614 B.R. at 551-52 (surveying cases, noting the wide range of sanctions granted where creditors wrongfully retained vehicles post-petition, and granting $7,000 in punitive damages even though compensatory damages were only $150); *In re Edwards*, 607 B.R. 530, 538 (Bankr. W.D. Va. 2019) (citing *Budget Service Co. v. Better Homes of Va., Inc.*, 804 F.2d 289 (4th Cir. 1986)) (finding $25,000 in punitive damages reasonable under Fourth Circuit precedent upholding punitive damages amounting to over 2,000% of compensatory damages for willful violation of the automatic stay).

Considering Dinkins Auctions' intentional and unjustified retention of the Vehicle for six weeks despite being informed by Debtor's counsel of the automatic stay violation and in egregious defiance of the Court's Turnover Order, the Court finds that punitive damages in the amount of $6,000—approximately equal to the amount of the actual damages awarded—are warranted to deter similar future conduct.

## CONCLUSION

For the reasons set forth above, the Court finds that Dinkins Auctions willfully violated the automatic stay and is liable to Debtors for damages pursuant to 11 U.S.C. § 362(k). The Court awards to Debtors attorneys' fees of $5,890.50, costs of $382, and punitive damages in the amount of $6,000 due to the egregious nature of Dinkins Auctions' conduct. Accordingly,

**IT IS HEREBY ORDERED** that Dinkins Auctions shall pay Debtors punitive damages in the amount of $6,000.00 and shall pay Moss & Associates, P.A. the total sum of $6,272.50 by sending payment to Debtors' counsel at Moss & Associates, Attorneys, P.A., 816 Elmwood Avenue, Columbia, SC 29201 within thirty (30) days of June 2, 2025 (the original date of entry of this Order).

**IT IS FURTHER ORDERED** that the Clerk's Office shall direct that a copy of this Order be served on (a) Dinkins Auctions and Debtors via first class mail and (b) counsel for Dinkins Auctions and Debtors by email.

**IT IS FURTHER ORDERED** that the terms and conditions of this Order shall survive any dismissal or conversion of this bankruptcy case.

**AND IT IS SO ORDERED.**